Thank you, Your Honor. May it please the Court, my name is Michael Fox and I represent the appellant's Prestige Consumer Healthcare and its subsidiary MedTech Products, Inc. I'd like to reserve three minutes for a rebuttal. Okay, please watch your clock. Your Honor, a series of errors by the District Court resulted in a nominal and ultimately unjust jury verdict, an irreparable harm, and an exorbitant award of attorney's fees that failed to account for plaintiff's limited success. As a result, the Court should order a new trial and vacate the attorney's fee award. Addressing the District Court's errors, a series of errors, as set forth in the briefing, there were many, but I'd like to address three. The first I'd like to address is the District Court erred back when it ruled, early in the case, that the instant redeemable coupon or the rebates provided during the business savings events must be included in net price. That is, it ruled that the value of the redemptions going directly to the Costco members had to be included in net price, even though the purchaser, the buyer from Prestige, received none of that. Hold on, why isn't that similar to Fred Meyer or ABC? Well, ABC relies on Fred Meyer, and Fred Meyer doesn't deal with a similar redemption or coupon. In Fred Meyer, there's a cut to the chase ruling that the redemptions from the coupons had to be included in net price, but what nothing in Fred Meyer addresses, at all, is what the Fred Meyer was doing with the redemptions. So, for instance, and we mentioned this in our briefing, Judge Mendoza, the opinion in Fred Meyer doesn't talk about the pricing to the ultimate purchaser in Fred Meyer. So, Fred Meyer raises the price of two cans, gets some price redemption from Tri-Valley grocers. Unless it passes that entire amount on to Fred Meyer's customers, it's not a similar redemption, and that's the fact that we have here. We have Costco's members who pay their membership fee to Costco to go out and get them the best price that they can purchase it, and as part of that, a program by which Costco offers is these instant redeemable coupons or instant redeemable scans at the register, where the purchaser is guaranteed to receive that full amount, and that's a distinguishing factor which is nowhere mentioned in Fred Meyer. But the price drops, right? The price drops. But unless the entire amount, and this is key for net price, for net price, and in a secondary line case, we're talking about the acquisition price for the purchaser, for the buyer from the supplier, Prestige's customer. If that customer gets $3 and only gives its customer $2, which is what one can read from Fred Meyer, that's not passing on the full value of the redemption to the customer. But it's some value, and it does reduce the price, which puts them in a favored position vis-a-vis the customer. It puts, it actually doesn't, because vis-a-vis the customer, the customer is getting the redemption. The customer is getting the rebate directly from Prestige, in essence. All there is is a middleman who's collecting coupons and asking Prestige to pay us back for those coupons. But how is that not benefiting Costco? Because Costco never, well, first of all, Costco's business model, and this was the evidence at trial, is memberships. Costco wants more members. Costco makes its money off of getting more members into its stores, period. Costco, with that redemption, with that $3 off, didn't change its profit margin one iota on the sale of Clear Eyes, which is different. But it made itself more attractive to customers. You're not only, you know, they pay, yes, they pay for their membership, but then they get a, you know, decreased price from Costco over Costco's competitors. They're getting a decreased price because they hired Costco to go out and negotiate a better price, which is actually much more, and this is why we argue this case actually falls more so into the Volvo paradigm. So you have a situation where you have members paying a wholesaler, in this instance, paying Costco to go and negotiate their price. But, Mr. Fox, I guess I don't follow how membership really enters into it. In Volvo, you're dealing with bidding on heavy equipment, kind of one truck at a time. The fact that you have a Costco membership that entitles you to shop and get some discounts on some things, some rebates on some others, but, you know, I don't think, I mean, does anyone really sign up for a Costco membership expecting, you know, negotiating this contract with Costco? So I want to make sure you get me the best eye drops. That's why I'm paying you the $50, and then it'll all net out. Well, in fact, in this case, the testimony from plaintiffs' so-called lost customers was exactly that. They paid for their Costco membership fee. They only went and used Costco at that time because Costco had gotten them a better price, and that, in fact, when the promotions were not in effect, that they had basically paid for their memberships fee to have access to, they used, they purchased their products from plaintiffs, and that's the situation which Justice Ginsburg pointed out in Volvo would not be a violation of the Act. It's a similar situation where you have the buyers, I'm sorry, the ultimate customers asking Costco and Sam's Club in this instance to bid, and, in fact, that's exactly the fact pattern which we had as to Sam's Club. In that instance, we said, can you negotiate us a better price? This was the testimony of Sam's Club's corporate representative who said it was the customers who came to Sam's Club and said, can you negotiate us a better price? Can you do something better for us? So it definitely fits almost exactly into the Volvo paradigm in that instance. Product by product? That's what they're negotiating? That's what the testimony showed? They did, we forgot to clear eyes. The testimony from Storm Quattlebaum was that it was the customers who came and said, can you get us a price? Can you get us a discount on Clear Eyes? They asked Sam's Club to go bid to Prestige, and that's what the testimony was. Sam's Club's representatives then went to Prestige, said we have members who are interested in buying from you at a discount and truckloads, promotions, what can we do? And they went and they did it. Why is the characterization of this, I get that we have the chain store paradigm and this Volvo distinction, but why isn't this predominantly a question of fact as to what the dealings actually are and the motives actually are of the customers and the businesses? Well ultimately it matters in this case because Prestige was precluded from getting an instruction in line with Volvo that would have allowed the jury to make that decision. So pre-trial, in part as a But then later on when the court ruled, when the district court ruled that Volvo, I'm sorry, that U.S. Wholesale rather than Volvo would apply to the case, the district court similarly refused to instruct on competition that to be in competition they would have to be after the same dollar. And if you could explain to me why U.S. Wholesale is not applicable here? Well again, U.S. Wholesale had a cut to the chase that this was more, this was the chain store paradigm without evaluation at all in any part of the opinion of the membership paradigm as I've described. And that membership where the members are paying Sam's Club and Costco to go and negotiate and obtain their best prices for them, that fits in the Volvo paradigm and that affected the way judge, the way the district court handled the case. It affected how evidence was allowed to come in and it affected the ultimate instructions in the case. Mr. Fox, this is the second time you've referred to one of our court's opinions as a cut to the chase. Are we not just as bound by them even if their reasoning isn't as elaborate as you might hope them to be? You're bound by them if it's the same facts. And the same facts aren't recited in the opinion that I just presented at our trial. And so that's a distinguishing factor which allows this court to separately evaluate, one, whether Fred Meyer coupon rule should apply and it shouldn't. And two, whether the U.S. Wholesale rule or U.S. Wholesale as a distinguishing case from Volvo should apply. If we're not in the chain store paradigm, we're in the Volvo paradigm and instructions should be more in line with Volvo. Can you explain that to me because I honestly don't see how we're not in the chain store paradigm as Judge Fitzgerald held. I don't see how this is akin to a bidding process at all. Again, Your Honor, I would just, as to Sam's Club, it's most definitely a bidding process because it was the ultimate Sam's Club members who went to Sam's and said, can you get us a good price? That's no different than the Volvo truck purchaser, ultimate truck purchaser going to the dealers and trying to get a dealer to bid for them and the dealer then going to Volvo and getting the best price for those trucks. So factually, Sam's Club fits into the Volvo paradigm. And whereas we may think of Costco and Sam's Club as chains because there are many of them, they have a different business model than having gross inventories that are available to all comers. And that's the distinguishing factor, frankly, of the chain store paradigm. Inventory available to all comers for both Sam's Club and Costco, that's not the fact. Those aren't the facts and they weren't. So the facts in our case showed that those were different. Those facts aren't mentioned at all in the U.S. wholesale opinion. Can't all comers become members, though? They can pay for membership and pay for membership and then get that membership benefit, but that's different. They're paying for a benefit to then, they're paying for Costco and Sam's Club to then go do a service for that. I guess I'm trying to understand what work I understand that Volvo distinguishes itself from the run-of-the-mill case, but can you explain to me kind of the the Robbins and Patman logic of why a case like this is why a court would be erring in treating this as favoritism to some suppliers given this mechanism? I mean, I get there's the membership, but how is that still not actionable under Robbins and Patman? Because they have to be competitors. The plaintiffs have to be competing after the same dollar. They have to be competing for that same customer. And what Costco and Sam's Club are doing isn't competing for their own, isn't operating on a profit margin for themselves. They collect membership fees and when they get the discounts they pass, such as the discounts in this case, they pass them all directly. I guess, you know, I'm not sure it's not not not part of this case, but we think about other questions of market definition and antitrust law, I get their distinct questions, but it wouldn't be surprising to in certain cases to see certain Costco and Sam's Club lumped in with other distributors at the same level who don't have a membership structure. I think the logic in those cases and that kind of market definition is that they're chasing the same dollar. So if that's true for other areas of competition law with respect to market definition, why does that logic not apply here? Well, the logic would have to apply here based on the specific facts presented and based on who the plaintiffs were and whether they were competitors. And whether they were competitors requires an evaluation of appropriate factors, including whether they're after the same dollar. And when the evidence in the case was that they were not after the same dollar, yet prestige was precluded from making that argument and the jury was not instructed about what to do with an argument like that, that results in an erroneous ruling here. So we can come up with other hypotheticals where Costco and Sam's Club may have competitors and may be in a competitive market which affects the market for Clear Eyes. But this isn't that case. In fact, the evidence in this case was that whereas this helped prestige gain market share in Clear Eyes, there was also evidence that it was doing so to meet the price of its competitors. And so it was actually having the desired effect to improve competition and lower prices to the ultimate consumers. And that's what antitrust laws are frankly designed to do. But enforcing the RPA in the manner that the plaintiffs are trying to do it doesn't foster that. It results in higher prices to the ultimate consumer. It results in less competition. And so if we're looking at what the Robbins and Patman Act was designed to do and what it was designed to protect, protecting... Wait, how does it result in less competition? I guess I don't understand that argument. It results in less competition. It results in less competition because the plaintiffs aren't purchasing. You have the plaintiffs aren't purchasing, the plaintiffs aren't passing on benefits directly to their customers. There's their lower cost directly to their customers. In fact, the evidence is the plaintiffs... Isn't it the opposite that's happening here? I mean, they're saying, hey, give them the same price, give them the same benefit, give them the same rebate. Why isn't that increasing competition? Because when they received those same types of discounts, similar discounts in similar amounts, when they received them, they didn't pass it on to their customers. And so it wasn't increasing prestige's market share and it wasn't increasing competition for ClearEyes. In fact, that's why Prestige went and looked for alternative channels in which to distribute ClearEyes and found an alternate paradigm in the club stores in which it was able to reach ultimate purchasers of the product and increase its market share that way. Not in a predatory way, not in an otherwise illegal way, but to foster competition such that the evidence in trial was that even Vizine started to copy the same model and try and go into those same stores. And so competition was fostered by what Prestige was doing, not what the plaintiffs are seeking to enforce here. And so, and again, just to address your point, Judge Johnstone, if we're in U.S. wholesale, then the jury should have been instructed like U.S. wholesale. And the jury in U.S. wholesale had an instruction with regard to substantial injury to competition. There had to be a requirement or showing of that in order to establish the third element. Our jury was not so instructed. And the jury in U.S. wholesale was instructed with regard to functional discounts, that if you find a functional discount, which there was ample evidence of here, then you must find for Prestige. But our jury wasn't instructed like that. A jury that was instructed received those two instructions found for the defendants in U.S. wholesale. Well, they were told if this was a functional discount, then, you know, you have to find for the defendant. They weren't told that. That's the problem, Your Honor. They were told if you find functional discounts, you find the plaintiff hasn't met their burden of proof as to one element. But then when the jury was admittedly confused about that, the district court told them they could ignore that concept of the element. So it's a series of errors with regard to the instruction as well. No, it didn't. I told them it must reach a unanimous decision on each element of the... Right, but the jury's question, Judge Wardlaw, was do we need to be... No, they had subpoints. They were asking, and subpoints. Do we need to be unanimous as to the subpoints? And the court said you need to be unanimous as to each element, as to those concepts. Those are just things for you to consider. And so it allowed the jury to pick and choose between those three concepts, and not necessarily be unanimous as to those concepts, and not necessarily be unanimous. They could have found two, but not the third. They could have found just one, but not the third. And then they were only told they needed to be unanimous as to the element, the first sentence itself. And this is compounded by the fact that when... It's compounded by the fact that when they would go to the jury forum, there was nothing telling them what to do about functional discounts, like there was for Prestige's other defenses. I see I have only about two minutes left, so I'd like to reserve that for rebuttal. Thank you. Good morning, Your Honors. I'm Mark Poe for the Plaintiff Wholesalers. Now, of course, if Your Honors have questions for me about the issues raised by Prestige's appeal, I want to make sure I address those. But I think that's all laid out very well in our answering brief. And so I would like to use my time today to address the issues in our cross-appeal of the Fees Award. And on that, I want to emphasize a couple of points. First, the District Court erred in setting the hourly rates. It awarded us the rates that we had received in a contract dispute, where those rates were based on two-year-old data. And then this court gave a 1% annual increase to those rates, supposedly to account for the complexity of this case and inflation. Of course, 1% doesn't account for inflation by itself, let alone the complexity. The District Court's decision on rates violated essentially every precedent on rate setting. And just listing them quickly, the District Court didn't use as the starting point the prevailing rate for antitrust litigation in the Central District. It used two-year-old data rather than current data. It set rates we had received in a contract dispute rather than work of similar complexity, and overtly deemed it important to constrain our rates to a historical level out of concern that if it awarded the actually prevailing rate, we would be able to use that as a marker for future cases. I want to focus on two of those issues. First of all, the District Court's reduction, apparent reduction, in the prevailing rate based on firm size. And second, the court's effort to... Well, did the judge do that though? Pardon? On firm size, he didn't explicitly do that, did he? I think that he did, Your Honor. If you look at page 7, carrying over to 8 of the fees award... Could you give me the... Yes, this is ER 7 and 8. Thank you. The paragraph that carries over from page 7 begins with the topic sentence, the court agrees with defendants that the requested hourly rates are unreasonable. Then he cites the number of rates we've been awarded in different cases. And then the conclusion is that the court declines to award a rate that is far above what has previously been awarded, especially... I'm sorry, this is not firm size, Your Honor. Pardon me. The firm size issue is that... Well, what he really said is that it is not simply the size of plaintiff's counsel's firm that is at issue here. And he went on to explain he did not actually determine the rates simply... He has a sentence that says it is simply unreasonable to award big law rates to a four-person firm representing mom-and-pop warehouses. But after he says that, he says that it is not simply the size of plaintiff's counsel's firm that is at issue here. My question to you is, you know, maybe, you know, I would have awarded a higher fee having been from a big law firm and understanding what it takes to prevail in an NHRS case such as this, especially in such an archaic area of the law. But he... Did he abuse his discretion in awarding what he did? And that's a pretty high standard. I believe that he did abuse his discretion just by simply not applying the standard that has been in place for decades from the Supreme Court through numerous opinions of this court, which is just that it is a question of the reputation, experience, and skill of the attorney. In none of those opinions for decades has there ever been any mention of the size of the firm that the attorney works for. And in fact, when you look at his reasoning, Your Honor... But was the argument raised? Was the size of the... I mean, you had to rule on it if it was raised, right? It was raised, Your Honor. And so we had cited the various district courts that we've cited again here in our briefs that have held that firm size is simply not a factor because there already is a rule, and it references the skill, experience, and reputation of the attorneys. Let me ask you on another point. You said the rates were out of date, but he used the real rate book, real rate report from 2023. Is that right? 2022. So he actually... He just used the rates that we had been awarded in the Trendsetter case, Your Honor, which had been based on 2022. And then he applied this 1% annual increase to account for... When was this case tried? This case was tried in the end of 2023, December 2023. So there was, for example, the most recent data at that time was the 2023 real rate report. And even if it were permissible for this court in an antitrust case to award just general litigation rates, the third quartile rate in the 2023 real rate report was 1,159. This is at S.E.R. 80. But I want to return back to the firm size issue, which is that the court's rationale was that big firms should be awarded higher rates because they, and I'm quoting, usually work for large corporate entities. But obviously, there's just no precedent saying that rates... Well, again, there might be dicta in some of what the judge ultimately said, but in totality, though, is that how he made that decision in terms of establishing the rate? I think it's quite clear from his opinion that he put a downward adjustment based on his view that because we're a smaller firm. And I would bring Your Honor's attention to another case. This is Purdue v. Kenney, a Supreme Court case. This court echoed it in C. Chris v. I'm forgetting, Brady-Hamilton. And I'm quoting here that in Purdue v. Kenney, the Supreme Court says, reasonable hourly rates are simply, this is the quote, the prevailing rates, prevailing market rates in the relevant community for a paying client who was billed by the hour in a comparable case. So that suggests, I mean, certainly a comparable case to an antitrust case is the other side of the case, what defense counsel are billing in antitrust cases. And a real concern that I think we have to confront here is the directional disparity that would result from endorsing, and this court would be the first one to rule on this issue. I think you probably saw in Gonzalez the issue was specifically reserved in footnote 9. But it would make a directional disparity because plaintiffs in antitrust cases almost always, certainly the most famous plaintiffs bar antitrust, Your Honor will know, of course, Bleacher-Collins up in the Northern District, the Alioto firm and the Joe Saveri firm. It's just long been the structure of the antitrust bar that plaintiff side comes from small firms and the defendants are represented by large firms. And so if we say that firm size is relevant, then there will be a directional disparity between what the defendants are being paid by the hour versus what the plaintiffs are being paid by the hour. Well, the judge is considering experience. Isn't that really the thrust of his comments, the experience and reputation, et cetera? On that, Your Honor, I would modestly submit and direct you to our declarations in support of the fees. I mean, there's no question, we asserted at the District Court, we are by far the most experienced and have the highest reputation of any RPA litigation counsel on the country. There is no pushback from prestige on that, let alone from the court. And so, again, I do want to be humble. We're essentially the max bleacher of RPA litigation. And so if, you know, true to what it should be doing, the court is awarding rates based on reputation, skill and experience, we should be, I mean, higher than, there shouldn't, we shouldn't. You're great, is what you're saying. So that the issue is... We understand that. Yeah, there would be, there would just, it would work both ways, right? And so you would have very well-renowned lawyers from small firms receiving a lower rate, whereas, and again, no disrespect, but lawyers, partners at big law firms who no one has ever heard of, no one has ever heard their name in this practice area, and they would be receiving far higher rates than the plaintiff side. I think what he was thinking was not that they were being paid by large corporations, but that they have higher overhead. So to accomplish the same number of hours, they already have built in all this expense. So that, I'm just reading how he talked about it. That's what I think he's referring to. There too, I wouldn't see how a firm's decision to rent the top floor in the U.S. Bank building should weigh in its favor when it comes to fee awards. Well, usually economies of scale would point the other direction, right? You would expect that whatever overhead a large firm has is spread over more people for their output. I mean, I think that's probably true, but I don't see why, I don't see anywhere, like in the existing precedent of setting rates based on prevailing market rate for scale experience and reputation, how that would be a permissible factor. I want to talk about the other area, though, which is the district court's overt interest in constraining these rates to keep us from receiving higher rates in future as-yet-unfiled cases. And I apologize, Judge Mendoza, this is what I was referring to, the carryover from ER-7 to ER-8. He didn't want to award a rate higher than we had previously been awarded, especially given that it could create a new benchmark for plaintiff's fee requests in the future. Where do you say that? This is at the very top of ER-8, the carryover sentence from 7 to 8. Do you have it, Your Honor? I'm still on the big log. Oh, you're talking about ER pages, not numbered pages.  Okay. Very top of ER-8, you said? Yes. According to clients who award a rate. Especially given that it could create a new benchmark for fee requests in the future. And, of course, there is certainly no precedent that permits a district court to limit hourly rates out of fear of what might happen in future as-yet-unfiled cases before different judges. In fact, it's just the opposite. In Moreno, this is at 1115, this court wrote that rates must be set with respect to, and I'm quoting, the particular work performed and the results achieved in this particular case. Now, that is the end of it. Trial judges are to concern themselves with the particular case before them, not what might happen elsewhere. This feeds into the same principles from Moreno that courts are not to hold the line at a particular rate. Moreno further says that if the load star leads to an hourly rate that is higher than past practice, the court must award that rate without regard to any contrary practice. So, I suppose I would leave it at that. This is contrary, certainly, to Moreno and many other precedents. It's just no business of a particular district court judge trying to constrain the rates that plaintiffs' counsel receive. This goes back to the directional disparity, Your Honors, which is that courts have no ability whatsoever to constrain the rates that are paid by antitrust defendants to defense counsel. By definition, courts, they only ever review the rates that are awarded to plaintiffs, and even then, they only ever review the rates that are awarded to the plaintiffs who prevail over the defense counsel who are receiving the prevailing market rate. I think it would be very unusual to endorse a structure where courts are then interested in suppressing only one side of those rates. Well, I guess I'm wondering whether some of what the court's discussion of big corporate clients and big firms versus representing mom-and-pop wholesalers is maybe backing into the relatively modest recovery in this case. So, another, you know, set aside the question of whether it was considered in this case, but another consideration is if it was taken on a contingent fee, the rates do realistically rise and fall with the level of recovery. I'm not suggesting that it wasn't substantial for purposes of the statute and the law in those pieces, but is that a relevant consideration in this case in particular, given the relatively modest recovery? No. And so, A, that wasn't mentioned, but B, I think your Honor has probably perceived we took some umbrage at the allegation of limited success here. We won all four causes of action that were tried. We received all of the injunctive relief we requested. That injunctive relief was then expanded nationwide to all family-owned wholesalers. This was an unbridled success. And the point of the antitrust laws, your Honor, is not to win money for plaintiffs. The point of the antitrust laws and the reason why there's a private enforcement action is to promote enforcement of the antitrust laws to promote competition. And so, really, you know, there was far too much focus in Prestige's brief as to the amount of money awarded and none given to the fact that the field of competition for the pricing of clear ice has now been leveled by virtue of what we did nationwide in this case. And so that would not certainly be a basis for reducing the rates. I want to address before I sit down the district court's further errors in refusing to grant an enhancement on the hourly rates based on the factors the Supreme Court of California set forth in Ketchum v. Moses. Now, there, the court first erred by reasoning that the first three of those factors, the novelty, skill, and the contingent risk, were already subsumed in its analysis of the federal load star. Now, beginning with the contingent risk factor, this was just plain legal error. As you saw, this district court reasoned that this case was not truly contingent because we would receive fees if we win. Now, and I think with no response from Prestige, we point out that is the definition of a contingency case. The lawyers get paid if they win. And that was precisely the case we cited, Green v. Dillingham. This is a California Court of Appeals case. That superior court misunderstood the contingent risk factor in precisely that way. And Green v. Dillingham wrote, we must remand the matter to the trial court for it to exercise its discretion on whether a fee enhancement is merited, in this case, for contingent risk. That's at page 15 of our grade brief. So true to Erie v. Tompkins, if the Court of Appeal of California says that where a trial court makes exactly this error, it needs to be remanded for consideration, this court should follow suit. But the other factors are also error. The novelty and skill, this is just factually wrong. Novelty and skill were nowhere mentioned in the district court's discussion of the Lodestar. And it's also factually wrong because he didn't set the rate based on novelty or skill. He set it based on trendsetter with a 1% upward adjustment. Now, he didn't, had he gone and evaluated trendsetter and said that counsel in that case exhibited exemplary skill, that case was highly complex just like this one, that could perhaps be permissible. But he didn't evaluate trendsetter whatsoever, just attached 1%. Then the last one, and I'll finish with this, the fourth factor he also erred on, this was the only one that he explicitly considered. And he found that this case had not precluded other employment because the other specific cases we had identified that we had passed on because of this were also RPA cases that were to be taken on contingency. Now, there's just, A, there's no precedent for that rule. He didn't cite anything. And then B, it really makes no sense because the, what do we, well, I should start with this. What do we mean is, for example, there are firms that specialize in 1983 cases. Under this reasoning, those courts could never say that, those firms were never precluded from other employment because they would say, oh, you only gave up other 1983 cases. What he seems to be suggesting is that in order to satisfy the precluded from other employment factor, a specialty firm like ours has to show that we forwent work in some new practice area to us or that we forwent work on an hourly basis. It just makes no sense. And I will say on the fees just now in closing, I'm a bit mystified by what the court did and, frankly, by how often this court has to deal with attorney's fees issues. I don't know if it's because they always come at the tail end of a case and judges want to be done with it, but the precedent is not hard to apply. Those four principles that I went through at the beginning, they're set forth in C. Chris v. Brady-Hamilton, Roberts v. City of Honolulu, Moreno. All of the precedents we cited list those. It should be a fairly simple matter for district courts to walk through those factors. You first identify the prevailing rate. If you do all that and then you adjust upward or downward, you have exercised your discretion. But if you don't mention any of those factors and just come up with some arbitrary award based on some case in a different practice area in the past, that is an abuse of discretion, Your Honors. Thank you. Thank you, Counsel. Mr. Fox. Thank you, Your Honor. With regard to fees, there was limited success and the award was excessive. To Judge Johnstone's point, the ultimate jury verdict in this case showed that there wasn't substantial harm to competition. This is very similar to what Volvo said about a $30,000 sale of trucks for an additional 1.9% discount. What do we do with all the references that the district court judge had about the firm size? And it seems to imply that as long as the firm size, that there is a large firm on one side, that we should increase, that's what they're arguing, that that's what the district court judge indicated, that we should give them a higher amount of a rate. Well, sure, Judge Mendoza, but what the court is actually required to do and what the district court did was evaluate all of the factors under Ketchum. He listed all of them, he addressed all of them in his written order and at the hearing, and he exercised his discretion accordingly. And frankly, with regard to considering the fees and using firm size as one factor, not the distinguishing factor, not the sole factor, the goal was to find out what it would take to reasonably compensate these attorneys for what they did. But firm size has never been a factor that we've listed. I understand the Second Circuit said that firm size sheds light, whatever that means, but those aren't the factors we've listed. And in fact, to me, logically, why would firm size make a difference? Again, it would only go towards making a difference, towards evaluating what rates plaintiffs are able to command. And that's why what the judge was doing, or what the district court was likely doing, I see my time is up. Do you want me to continue? Oh, yes, of course. Answer the question. What the district court was doing was trying to evaluate what was a reasonable fee for these attorneys for what they accomplished. And so looking at their firm size, and these attorneys is the standard, ultimately. That's why you look at all of the other catch-em factors. But here, the judge said, for example, big law firms usually work for large corporate entities. So? Well, these plaintiffs were, in fact, large multimillion dollar enterprises. So, and in fact, the evidence before the district court was that a large defendant, in this case, was paying its attorneys less than the plaintiffs were requesting. Yeah, but by that logic, then they should get the same as lawyers from large law firms, if they're working for the same sort of client that he refers as the rationale for paying large law firms more. No, what the standard is, what they should get paid, what they're able to command. And in fact, the plaintiffs, this is, we mentioned it, the plaintiffs mentioned, referenced the fact that Dewey LaBeouf was a plaintiff's firm and had actually been paid by its client to pursue a Robinson-Patman Act case. And those were the actual fees Dewey LaBeouf collected from its clients, which it then, in turn, included in its fee award. So that goes to show you what's the value that the plaintiffs' attorneys are delivering in the case. And so if we look at the whole scope of this case, Your Honor, rather than protecting competition in the market for clear eyes, the entire case hinges on plaintiffs using the RPA improperly to protect themselves as so-called competitors of Costco and Sam's Club and enrich their attorneys at multiple amounts more. But what do you mean, use the act improperly? What do you mean by that? There's no evidence in this case that there was substantial harm to competition. Well, now we can argue about whether or not that's the standard. But because there was no substantial harm to competition and because the jury was improperly instructed, we need to go back to the district court. The judgment should be reversed. There should be a new trial. And then, if they're properly instructed and there's a proper verdict in the plaintiff's favor, we can evaluate whether or not they're entitled to a reasonable fee at that point. But it's premature. All right. And the judgment should be reversed. Thank you. Thank you, counsel. LA International Court v. Prestige Brands will be submitted and will take up American Encore v. Adrian Fontes.
judges: WARDLAW, MENDOZA, JOHNSTONE